IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　*Plaintiff,*<br><br>vs.<br><br>JAMES EDWARD WHISENANT, JR.<br><br>　　　　*Defendant.* | DOCKET NO. 1:22-CR-44<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR VARIANCE; EXHIBITS** |

Defendant, James Edward Whisenant, Jr., by and through his counsel of record, Assistant Federal Public Defender Mary Ellen Coleman, hereby submits his position regarding the sentencing factors under 18 U.S.C. § 3553(a). Mr. Whisenant's sentencing position is based on the attached sentencing memorandum, exhibits, and any further evidence and argument that may be presented at sentencing.

　　　　　　　　　　　　　　　　　Respectfully submitted:

　　　　　　　　　　　　　　　　　s/ Mary Ellen Coleman
　　　　　　　　　　　　　　　　　Mary Ellen Coleman
　　　　　　　　　　　　　　　　　NC Bar No. 45313
　　　　　　　　　　　　　　　　　Attorney for the Defendant
　　　　　　　　　　　　　　　　　Assistant Federal Public Defender
　　　　　　　　　　　　　　　　　Office of the Federal Public Defender
　　　　　　　　　　　　　　　　　1 Page Avenue, Suite 210
　　　　　　　　　　　　　　　　　Asheville, NC 28801
　　　　　　　　　　　　　　　　　(828) 232-9992 Phone
　　　　　　　　　　　　　　　　　(828) 232-5575 Fax
　　　　　　　　　　　　　　　　　Mary_Ellen_Coleman@fd.org

Date: January 8, 2024

# MEMORANDUM

Defendant, James Edward Whisenant, through undersigned counsel, hereby submits the following information for this Honorable Court to consider in fashioning a sentence which is sufficient but not greater than necessary under 18.U.S.C. § 3553(a). Mr. Whisenant is before this Court having pled guilty to a one count of traveling in interstate commerce to engage in illicit sexual conduct with another person in violation of 18 U.S.C. §§ 2423(b) and 2462(a). A Final Presentence Investigation Report ("PSR") was prepared on March 3, 2023. Doc. 30. The PSR calculates an advisory guideline range of 262-327 months based on a total offense level of 39 and a criminal history category of I. PSR ¶ 108. Mr. Whisenant has objections to the advisory guideline range still pending. If granted, his advisory guideline range would be calculated at a base offense level of 33, and his advisory guideline range would lower to 135-168 months. PSR p. 30.

As will be further explained below, and pursuant to the terms of his plea agreement Doc. 20, ¶8(a), Mr. Whisenant specifically requests this Honorable Court grant his objections and sentence him to 180 months of imprisonment. Specifically, Mr. Whisenant is requesting this Honorable Court grant this sentence due to his prior personal history and previously untreated neurological and developmental disorder, and his potential for rehabilitation and treatment.

I.  **OBJECTIONS**

Mr. Whisenant maintains his previously filed objections to the offense level computation in this case and specifically to the cross reference to attempted production of child pornography in ¶ 70 of the PSR under § 2G1.3(c)(1) and alternatively the application of the distribution enhancement under § 2G2.1(b)(3) should this guideline be deemed to apply. Additionally, Mr.

Whisenant objects to the factual assertions that Mr. Whisenant told his mother to "strip his computer" in ¶ 50, and the 2-level adjustment in ¶ 73 for obstruction of justice. Mr. Whisenant maintains his argument that the facts in this case are insufficient to find the government meets its burden of proving the enhancement's application by a preponderance of the evidence for two reasons—they show neither the requisite willfulness, nor the necessary materiality to conclude that Mr. Whisenant attempted, or actually did, obstruct the administration of justice with respect to his offense.

Mr. Whisenant requests to incorporate the arguments in his previously filed written objections, Doc. 28. Additionally, Mr. Whisenant seeks to add the following information in support of his remaining objections:

### *Cross Reference*

The cross-reference does not apply in this case. Mr. Whisenant and the UCA had a telephone conversation amongst themselves, where "Whisenant asked the UCA if she was going to help him take pictures of her daughter with Whisenant's phone." PSR at ¶ 35. Both the Presentence Report and the government advocate for sentencing Mr. Whisenant under the child pornography production guideline due to this conduct. This argument is based on the private one-on-one telephone communication amounting to "seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct[,]" for purposes of § 2G1.3(c)(1)'s cross reference. This cross reference is designed to capture conduct prohibited under 18 U.S. § 2551(d)(1)(B). The Commission explained that the cross reference was for "offenses more appropriately treated under § 2G2.1[,]" USSG App. C, Amend. 325, and the Guidelines instruct that § 2G2.1 be used for offenses where the defendant

3

was involved with producing child pornography, USSG App. A, including—as most relevant here—soliciting or offering a minor to produce child pornography, 18 U.S.C. § 2251(d)(1)(B). Courts likewise view § 2251(d)(1)(B) as "analogous" to § 2G1.3(c)(1)'s cross reference. *United States v. Sammons*, 55 F.4th 1062, 1068 (6th Cir. 2022).

There is currently a circuit split over whether a private one-on-one communication comes under 18 U.S.C. § 2251(d)(1)(B)'s purview. *Compare Sammons*, 55 F.4th at 1068 (answering in the affirmative) with *United States v. Canff*, 955 F.3d 1183 (11th Cir. 2020) (answering in the negative). As an initial matter, the government's argument quotes Sammons, which recognized the circuit disagreement, to imply that there is a "uniform[ ]" agreement that a private one-on-one communication may be sentenced under the child pornography production guideline, USSG § 2G2.1. But if Mr. Whisenant's conduct does not violate § 2251(d)(1)(B) he should not be subject to the cross reference that sentences him as if he did violate that provision. In *United States v. Dove,* 247 F.3d 152 (4th Cir. 2001), the Fourth Circuit found that "relevant conduct under the Guidelines must be criminal conduct" in order to prevent individuals from being punished "by having their guideline range increased for activity which is not prohibited by law but merely morally distasteful or viewed as simply wrong by the sentencing court." *Id.* at 155.

This court should adopt the Eleventh Circuit's view that a private one-on-one message does not violate 18 U.S.C. § 2251(d)(1)(B). A straightforward statutory analysis demonstrates that this is the appropriate construction. Under the statute, an individual cannot knowingly make, print, or publish any notice or advertisement that seeks or offers sexually explicit contact with a minor in order to produce a visual depiction of that sexual contact. 18 U.S.C. § 2251(d)(1)(B). Although "notice" viewed in isolation is ambiguous and capable of many meanings, including a

mere "intimation…without reference to…audience size[,]" *Sammons*, 55 F.4th at 1066, the term "notice" does not appear in isolation. "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used[,]" *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). "[T]he cardinal rule [is] that a statute is to be read as a whole[,]" *id.*, because "[t]he meaning…of certain words or phrases may only become evidence when placed in context[,]" *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

The cardinal rule was not followed by the Sixth Circuit, which led it to erroneously conclude that a private one-on-one communication could qualify as making, printing, or publishing a notice or advertisement. The Sixth Circuit examined "notice" in isolation, noting that dictionary definitions did not necessarily reference a particular audience size and both everyday usage and other statutes used "notice" in a way that included a private one-on-one communication, such as a landlord giving a tenant notice that rent would be increased or the statutory requirements for a "notice" before depriving someone of property, such as by suspending a federal employee for 6 months or defaulting on a loan that triggers repossession. 55 F. 4th at 1062. But Whisenant does not argue that "notice" can never include a private one-on-one communication under any meaning, only that it does not carry that meaning in § 2251(d)(1)(B).

The Sixth Circuit engaged in the same flawed statutory analysis that the Supreme Court rejected in *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19 (1988). Shell declined to include income it derived from oil extracted from the Outer Continental Shelf by pointing to language

5

from the Outer Continental Shelf Lands Act, which stated that "[s]tate taxation laws shall not apply to the outer Continental Shelf" and that the section's provisions "shall never be interpreted as a basis for claiming any interest in the property and natural resources thereof or the revenues therefrom." *Id.* at 24-25. The Court didn't even engage with Shell's argument on the plain meaning of the excerpted language, because "the meaning of words depends on their context." *Id.* at 25. Shell failed to account for the fact that the relevant provision began by addressing states adjacent to the outer Continental Shelf, so after "reading the statutory provisions in the context of the entire section in which they appear[,]" the Court concluded that Shell was wrong and the law only meant that adjacent state's tax codes should not be directly applicable to the OCS when Congress incorporated that state's civil and criminal law to the area. *Id.* at 25-26.

The entire context of § 2251(d)(1)(B) shows that private one-on-one communications are insufficient. "Notice" is nestled amongst a series of terms that share a public audience requirement—"print[,]" "publish[,]" "advertise".[1] The Sixth Circuit's analysis wholly excludes § 2251(d)(1)(B)'s requirement that the notice or advertisement be made, printed, or published. Instead, the Court reasons that because Congress stated "any notice or advertisement[,]" there are no limitations to the form of notice, so a private one-on-one conversation must come within its ambit. 55 F.4th at 1067. But if "any notice" qualifies, why must there even be two people? If notice is merely intimating something, and one intimates to themselves in an email draft message that is never sent. The Sixth Circuit and the government's interpretation stretch the statute too far, perhaps even into protected First Amendment territory.

---

[1] "Print" means to "publish in print." Merriam-Webster, available at <https://www.merriam-webster.com/dictionary/print > . "Publish" means "to make generally known" or "disseminate to the public." Merriam-Webster, available at <https://www.merriam-webster.com/dictionary/publish>. "Advertise" means "to make the public aware of (something or someone), especially by means of a published or broadcast notice." Merriam-Webster, available at <https://www.merriam-webster.com/dictionary/advertise>.

6

The other flaw in the Sixth Circuit's approach is its reliance on Congress's purpose in passing § 2251(d)(1)(B). The Sixth Circuit stated it had to interpret the statute from the viewpoint of a federal legislator writing "a broad statute to cover all manners of solicitation for child pornography." 55 F.4th at 1069. But a few paragraphs before this assertion, the Sixth Circuit acknowledged that § 2251(d(1)(B) was enacted before Congress prohibited advertisements or solicitations for child pornography. 55 F.4th at 1067. And on a more fundamental level, courts do not construe criminal statutes as broadly as legally possible. The Supreme Court has cited the rule of lenity to reject the broadest possible construction of a criminal statute that its language could permit if there were "any doubt" that the statutory phrase required such a construction. *Yates v. United States*, 574 U.S. 528, 547-48 (2015).

### *Obstruction*

Mr. Whisenant was provided the "jail call" in question on January 5, 2023, in an mp3 format which contained both "channels" of speaker together (the caller and receiver). In response to the Government's assertions that he was the individual on a jail call telling his mother to "strip his computer", counsel for Mr. Whisenant contacted the Transylvania Co. Jail and learned that their inmate phone provider is Combined Public Communications ("CPC") and that inmate calls are initially stored in a two-channel/stereo recording, where only one side of the recording, the inmate or receiver, can be played. After obtaining a Rule 17 subpoena for this recording, counsel was advised that these recordings are only maintained by CPC for a period of 30 days. The requested call was from May of 2022 and was no longer available in a two-channel format at the time Mr. Whisenant was provided the mp3 in discovery. Exhibit 1, email. Mr. Whisenant maintains that it is his mother's voice, not his, stating "strip your computer. I hate that

7

thing" and not Mr. Whisenant. Because the two-channel recording was not preserved, the Court has been deprived from reviewing the best evidence available and should draw an adverse inference against the government's arguments for an obstruction enhancement. Additionally, Mr. Whisenant submits that the attached transcript prepared by Asheville Reporting Service under no direction from Mr. Whisenant reflects that it was his mother's voice. Exhibit 2, Transcript. The transcriber has attached a certificate stating that the transcript produced is a verbatim record of what is on the recording, to the best of their ability, and they have no financial or relationship outcome in this case. Exhibit 2, p. 9

## II. PERSONAL BACKGROUND AND CHARACTERISTICS

James Whisenant understands he has committed serious crimes and is very remorseful for his actions. Since his arrest he has been ready to accept responsibility and to begin the work to rehabilitate. He understands that taking responsibility for his conduct includes going to federal prison for a significant period of time and being placed on supervision for what is likely the reminder of his life. For the first time in his adult life James, is reaching a broader understanding of the difficulties he has had throughout his life with social communications and interactions. He is ready to combine this understanding with as much programming and treatment as possible to improve his ability to effectively interact with others in the community and reduce his isolation and inappropriate dependence on the internet for access to relationships. James' PSR and the accompanying psychological report (Exhibit 3), detail his personal, developmental, and psychiatric history. Therefore, it will not be repeated here in their entirety, but the important findings are highlighted. The information is provided not to excuse his behavior but to provide context for his actions and a constructive path forward.

### *An Unstable Upbringing*

James Whisenant is a fifty-year-old individual who experienced significant childhood instability and trauma. Shuffled between his parents and family members, James mental and emotional needs were rarely addressed. His parents divorced when James was around five and he went to live with his father. His biological father was verbally abusive, and the relationship was contentious. James was relieved to be returned to his mother's care around the age of ten. Exhibit 4, Cheryl Whisenant Letter; Exhibit 3, Report. But James' mother, Cheryl Whisenant, was an active-duty Naval officer throughout his childhood and he was often left in the care of other family members during her military service. It was during one of these periods, while in the care of a stepfather, that he was sexually abused. After the abuse was brought to light by a family member, James was again returned to his biological father due to his mother's military service. Exhibit 3, Report, p. 3. Legal action was not pursued against the perpetrator and James received no counseling for what he'd endured. Eventually, he returned to live with his mother around the age of 18 and at around 19 was adopted as an adult by James Edward Whisenant, Sr.

As will be discussed below, James entered adulthood with never having addressed clear limitations his social communications, or his childhood abuse. Mr. Whisenant has had adult romantic relationships, but he has lived in his mother's home for most of his adult life. Mr. Whisenant, Sr. passed in 2018 and at the time of the offense Mr. Whisenant lived in an apartment on his mother's property and assisted her with their small farm.

### *An Undiagnosed Neurodevelopmental Disorder*

School records and collateral interviews show that James exhibited neurodevelopmental disorder symptoms even as a child. He had difficulty in schooling and received Resource

Support Program (RSP) services. He experienced problems with language and speech and underwent speech therapy. Eventually he would earn his GED, but it was through a specialized program. As will be discussed in detail below, throughout his life, James has often had difficulty navigating peer relationships and social interactions. His sixth-grade report card noted that he was "still having great difficulty with peer relationships". Engaging in appropriate social exchanges and understanding social cues has always been hard for James. But, having been shuttled between parents, schools, and programs, and born during a time when "autism" as a diagnosis was still evolving, James was never given a diagnosis for these features. Nor was he given any behavioral interventions and support for his deficits in social communication, his verbal and nonverbal language impairments, and his difficulty understanding the perspective of others. His sentence for this offense, which will include a substantial period of supervision, is an opportunity to provide these interventions so that he can more effectively interact with his community and can mitigate against any concerns of future criminal conduct.

*Psychological Evaluation*

In preparation for his sentencing hearing, Mr. Whisenant participated in a psychological evaluation by Eric A Imhof, PsyD, and Kimberly G. Spence, PhD. The resulting report is attached to this memorandum as Exhibit 3 ("Report"), as well as their curriculum vitaes. This report has been previously provided to the government. Mr. Whisenant was given a battery of tests and participated in a clinical interview. In preparation of his report, the experts reviewed the pre-existing academic records, the relevant case related documentation, letters of support from friends and family (attached as Exhibit 5) and conducted collateral interviews with Mr. Whisenant's mother and longtime employer. Exhibit 3, Appendix A. Dr.'s Imhof and Spence

were asked to provide the court with a psychological evaluation of Mr. Whisenant, as well as, to provide recommendations to guide Whisenant's intervention and provide clinical care while incarcerated and under supervised release.

Based on their interview with Mr. Whisenant, review of existing records, psychological testing (Exhibit 3, Appendix B) and collateral interviews (Exhibit 3, Appendix A), Dr.'s Imhof and Spence were able to opine that Mr. Whisenant qualifies for a diagnosis of Autism Spectrum Disorder (ASD), without accompanying impairment, requiring support for deficits in social communication, verbal and nonverbal language impairments, and difficulty understanding the perspective of others. Exhibit 3, p. 1. Fortunately, the Dr.'s also conclude that Mr. Whisenant presents as a good candidate for monitored, community-based treatment. Exhibit 3, p.1.

### *Autism Spectrum Disorder*

Autism Spectrum Disorder (ASD) is not an excuse for James actions in this case, but an understanding of ASD can help explain how those with the disorder, like James, can become involved with maladjusted social-sexual behavior, and how interventions such as Cognitive Behavioral Therapy (CBT) can assist individuals with ASD in combating this behavior.

ASD is a lifelong, neurodevelopmental disorder characterized by significant challenges with social communication and interaction and the presence of narrow or restricted behaviors, concepts, interests, and activities[2]. The cognitive, social, and communication impairments associated with ASD greatly affect an individual's ability to successfully socially interact within their community and the overall quality of their lives. While all individuals with ASD demonstrate some level of difficulty within each of these areas, the degree to which their

---

[2] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision. Arlington, VA: American Psychiatric Association, 2022 ("DSM-5-TR").

11

problem-solving, coping skills, independence, and relationships are affected varies from person to person.

The diagnostic features of ASD articulated in the DSM-5-TR outline several reasons those with ASD struggle to engage in appropriate social exchanges; specifically pervasive impairment in reciprocal conversations, failure to comprehend and respond appropriately to social cues, and difficulty or failure to understand the emotion of others.[3] One of the defining features of Autism Spectrum Disorder (ASD) is impairment in social interactions and is often the result of difficulties in interpreting or 'reading' the verbal and non-verbal social communications from others in ways that align with normative societal expectations. These impairments are often attributed to a core deficit in Theory of Mind ("ToM"), a deficit reflected in the diminished ability to take the perspective of others to such a degree their behavior undermines the individual's ability to interact in ways that are generally considered appropriate and adaptive for a particular social context.

During his interview with the experts, James struggled to understand the logical or possible perspectives of others and was unable to offer age-appropriate insight regarding commonly accepted social/emotional behavior of others. While James' language usage and vocabulary skills may result in his appearing more socially capable than he is, he appears to have significant difficulty understanding and demonstrating critical social skills necessary for developing and maintaining appropriate and/or healthy romantic relationships. These deficits may have, in part or collectively, had a role in his judgment and decision making in the offense

---

[3] *Id.*

behavior in this case. Importantly, *these types of social skills can be learned and are targeted in intensive social skills intervention training*. Exhibit 3, Report p. 5.

It is undisputed that James committed a serious crime and is very sorry for his actions. He's pled guilty and is asking for a decade and a half of incarceration followed by supervision. Section § 3553(a)(1) requires the Court to consider the history and characteristics of James, as well as the nature and circumstances of the offense. These two factors cannot be fully taken into account without acknowledging James' ASD diagnosis. Since people with ASD have a hard time understanding social relationships and values and often turn to the Internet for their sexual exploration, it helps explain how a 50-year-old man with no criminal history is before the court for sentencing on such a serious offense. Understanding James' ASD diagnosis is critical in both understanding why he developed an inappropriate dependence on the internet for access to relationships and how his deficits had a role in his decision making in this case. It also provides us a roadmap which on how community-based treatment and resources can mitigate against any future offending behavior.

### III. A SENTENCE SUFFICIENT, BUT NOT GREATER THAN NECESSARY

Mr. Whisenant submits that the United States Sentencing Guidelines and 18 U.S.C. § 3553(a) provides two areas in which Mr. Whisenant should receive a variance. The first was identified in the PSR in paragraph 123, which states that the court may want to consider a variance based on the sexual abuse of Mr. Whisenant as a child. The second, is Mr. Whisenant's ASD diagnosis, it's potential impact on the offense conduct, and the fact that Mr. Whisenant is a good candidate for counseling and treatment within a community setting. The Report, in Appendix C, offers treatment recommendations that will assist Mr. Whisenant in developing his

13

Case 1:22-cr-00044-MOC-WCM    Document 38    Filed 01/08/24    Page 13 of 16

social skills, perspectives about non-verbal communications in others, and general executive functioning skills. Exhibit 3, Report, Appendix C. Among other things, treatment can help Mr. Whisenant in addressing maladaptive behavior and understanding illegal behavior. The Report, in Appendix D, also identifies treatment resources readily available in the region that Mr. Whisenant will be returning to live. Exhibit 3, Report, Appendix D.

A sentence of fifteen years followed by lengthy supervised release adequately reflects the seriousness of James' offense and is sufficient to deter him from any future offenses. James has never been convicted of a single crime but for speeding and operating a boat without registration almost twenty years ago. Prior to this case, James had never spent a single night in jail. Jail is an overwhelming experience for someone who has never been trouble, but even more difficult for an individual with social impairments, and has acted as a significant deterrent.

Individuals with ASD face a number of difficulties in a prison environment at as such a sentence of incarceration is qualitatively harsher than for someone without such a diagnosis. As the Report notes, due to his central coherence deficits, including social naivete, Mr. Whisenant is currently at significant risk of becoming a victim of abuse or violence within the jail setting, and has reportedly been targeted by other inmates on at least three occasions. As the result of his pragmatic communication challenges, social skill deficits, and gullibility, he struggles to understand non-verbal cues (gestures, expressions, body language, etc.) from others. Individuals with ASD such as Mr. Whisenant, have difficulty quickly processing the subtleties of verbal and non-verbal communication and face extreme challenges in navigating social interactions which leads to passivity, manipulation by others, and an inability to effectively defend themselves.

Finally, not only is Mr. Whisenant a good candidate for rehabilitation in the community, but he has family and coworkers willing to continue supporting him to ensure he stays on the right track. The letters of support attached to this memorandum are from individuals who are not mere acquaintances of Mr. Whisenant, but who have known him for years. They describe and corroborate Mr. Whisenant's social and communication challenges. They are aware of the nature of the offense and are saddened by his behavior. But they also tell the story of a man who is loyal to his mother and helps her daily, who has tried to work hard and has maintained employment for many years, and whose longtime employer and coworkers see as having the potential for rehabilitation. They are willing to continue supporting him and to help him remain law abiding.

For all these reasons, Mr. Whisenant submits that a sentence greater than 180 months is not necessary to accomplish the purposes of sentencing.

## IV. <u>CONCLUSION</u>

In summary, Dr.'s Imhof, and Spence have identified multiple factors that likely contributed to Mr. Whisenant's offense behavior and Mr. Whisenant exhibits several areas of protective factors that make him highly amenable to treatment in the community.

> 1) Mr. Whisenant qualifies for a diagnosis of Autism Spectrum Disorder (ASD), Level 1, without accompanying intellectual impairment, with accompanying language impairment, requiring support for deficits in social communication, verbal and nonverbal language impairments, and difficulty understanding the perspective of others.
>
> 2) It is likely that Mr. Whisenant's illegal behavior was facilitated by these deficits, as these deficits may have, in part or collectively, had a role in his judgment and decision making in the offense behavior.
>
> 3) Mr. Whisenant presents as a good candidate for monitored, community-based treatment and will benefit from highly specialized interventions and supports

necessary to reduce the potential for a future occurrence of behaviors of concern. Mr. Whisenant reported a strong willingness to receive specialized treatment to address his sexually maladaptive behavior, autism, social and communication skills deficits, and executive functioning deficits. Improving his ability to effectively interact with others in the community will reduce his isolation and inappropriate dependence on the internet for access to relationships.

4) Individuals with Autism Spectrum Disorder face many challenges while incarcerated. It is likely a continued lengthy prison sentence will prevent Mr. Whisenant from receiving necessary therapeutic interventions.

5) Mr. Whisenant takes full responsibility for his sexual offense behavior and understands the need for consequences. There is no information to suggest Mr. Whisenant has ever associated with individuals who live a criminal lifestyle or embraced antisocial attitudes/beliefs.

6) Mr. Whisenant currently has financial support and a safe living environment with his mother and the promise of employment from Mr. Pabon upon his release from custody.

7) Mr. Whisenant has previously had age-appropriate social and sexual relationships. This healthy sexual interest can be fostered through psychotherapy.

Mr. Whisenant asks this court to impose a sentence of 180 months, and to undergo any further treatment deemed necessary. The requested sentence is "sufficient but not greater than necessary" to serve sentencing purposes under § 3553(a).

Dated: January 8, 2024            Respectfully submitted:

s/ Mary Ellen Coleman
Mary Ellen Coleman
NC Bar No. 45313
Attorney for the Defendant
Assistant Federal Public Defender
Office of the Federal Public Defender
1 Page Avenue, Suite 210
Asheville, NC 28801
(828) 232-9992 Phone
(828) 232-5575 Fax
Mary_Ellen_Coleman@fd.org