

**Cheryl L. Whisenant**

**Suffolk, VA 23434**

RE: United States V. James Edward Whisenant, Jr. ; 1:22-CR-44      1/5/2023

To: The honorable Max O. Cogburn, Jr.

Dear Judge Max O. Cogburn, Jr.

I am sending this letter requesting leniency on behalf of James Edward Whisenant, Jr. who has plead guilty to his breaking the law.

I am Jim's mother, 70 years old and live in Suffolk, Virginia which is also Jim's home. I am a retired Accountant and former member of the United States Navy. Jim is my only son, and the only family I have that is close.

Jim has had many issues in his life yet none of them have involved breaking the law. He has been a good son although aggravating at times as most children are. He has never smoked, drank, or do drugs. He was born June 18, 1973. He was a sickly child with frequent ear infections and tubing's to try and correct the problems. He was on antibiotics for most of his baby through toddler years and it affected his overall health badly.

His father, Paul Edward Jennings was a man's man and had no patience with our son and his difficulties. However, Jim adored his father and sought attention with behavior such as, pestering, clinging or being a jokester so his dad would notice him. Unfortunately, this brought out Paul's anger and demeaning accusations "Stop being stupid, grow up, you're just spoiled", etc. I tried to get to the bottom of Jim's attention seeking behavior.
Jim was seen by a behavioral specialist and diagnosed as ADHD and Learning challenged and put on Ritalin when he was only four or five.

When we divorced, and I had moved to California. Jim chose to live with his father. I stayed in California, and he went to Arizona. It was heartbreaking and a very poor decision on my part. By early 1983, Jim wanted to come home. He said his father and stepmom (Karen) treated him badly, making him live outside in a camper and blamed him for everything that went wrong. Whereas Karen's son Kenny never did anything wrong. I had to take them to court to get my son back, it was ugly, but after thorough family investigations the court in Arizona ruled in my favor. Jim was returned to my custody in California.

At the time I was married to Robert Wesley Fox, an attorney in Fountain Valley, California. My poor decisions continued to complicate my son's life. While I was on active duty in the Navy it was brought to my attention by one of Robert's family members that my son was not being treated correctly. I soon discovered that Mr. Fox had been sexually abusing my son. I went on emergency leave from New Orleans, Louisiana. I got my son and all of our belongings out of California and divorced his step-father. Mr. Fox was not held responsible for his actions. We did not pursue legal action because of the additional damage that had been caused to my son and I didn't want to put him through more.

As Jim got older, I realized that my baby boy had gotten older but he was still very immature socially and emotionally. It was like he was on 12 or 13, yet his chronological age was 18.

My new husband, James E. Whisenant, loved my son and worked tirelessly to help get him over the early trauma. While I was deployed, Jim and James adopted each other. Jim was over 18 and made the choice on his own. I was elated when they let me know we were all one family. However, Jim's immaturity continued to cause conflict in his day-to-day life. We got him into a welding program at Tidewater Community College. College life was not for him as they wanted him to get up to speed in English and Math in addition to his welding classes. He quit the program.

Then he met a girl, Tanya, fell in love with the first girl he had ever dated and married her. For the next several years we were estranged.

He tried the military. He joined the Army, but before he even got out of bootcamp he was discharged. Social and emotional behavior stood in the way of him being able to be a team player. After all of that, he and Susan got divorced.

Finally, Jim came home again. James and I were very happy to be there for him at this point of his life. I believe that he was in his late twenties, early thirties. He got a job with Aim Services, Inc., and has been with them for over 17 years I believe.

Aim Services, Inc. has been a God send for Jim as they understood him more than anyone else has. They have had trials and tribulations with him as he still acted as if he was only 13 or 14 years old. Unlike other jobs/personnel they worked hard with Jim and became more like a family than a place of employment.

One of his supervisors bought a four wheeler, many of the crew did the same and started "The Over the Hill Riders (?)". They rode frequently on land owned by the company. Jim bought his own four-wheeler and practically lived at the farm where they rode when not at work. Once Jim was in the off-duty experiences with his co-workers they got to know him better. He was in his environment (a teenager out playing is all I can imagine) and it was enough that his work relationships seemed to improve. His "bosses" still had trying times with him, but he appeared to be learning. Jim is a hard worker and has high standards for the job to be done right. Always is there when they needed him and worked amazingly well on his own.

Jim's life seemed to be finally on tract. He played his video games which he loved. Rode with the guys, went to the movies every Friday. He helped me and his father with all of the farm chores and seemed happy for the first time in his life. My son is 100% devoted to me and what happened to cause him to go astray. I know it crushed him when his father died in

2018. James was his rock, even thought they had their days, his father loved him, and he knew it.

All I know is that has had an extremely difficult life and this crime has opened his eyes to how many people love him. I don't believe he knew how much his bad behavior would affect more than just him. I believe that he is truly remorseful for his behavior and accepts that he must pay for his transgressions. I do not believe that he will ever be involved in this type of behavior again. I do believe that with Counseling and Guidance he will never be tempted again to commit this type of crime.

I understand that mothers love their sons, however I know that he did wrong. I will stand by him no matter what and try to help him any way I can. He has him home here with me and I pray I live long enough to have him home again.

Sincerely,


Cheryl L. Whisenant